# Exhibit C

*Execution Version*

# PURCHASE AND SALE AGREEMENT

by and between

**BRIDGER LOGISTICS, LLC,**

as Seller

and

**JAMEX TRANSFER HOLDINGS, LLC,**

as Buyer

**dated February 22, 2016**

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered on February 22, 2016 by and between BRIDGER LOGISTICS, LLC, a Louisiana limited liability company with principal offices at 2009 Chenault Drive, Suite 100, Carrollton, Texas 75006 ("Seller") and JAMEX TRANSFER HOLDINGS, LLC, a Texas limited liability company with principal offices at 2009 Chenault Drive, Suite 110, Carrollton, Texas 75006 ("Buyer"). Buyer and Seller may be referred to herein individually as a "Party," and collectively as the "Parties."

## RECITALS

WHEREAS, Seller owns all right, title and interest in and to one hundred percent (100%) of the issued and outstanding limited liability company membership interests in, to, and of BRIDGER TRANSFER SERVICES, LLC, a Louisiana limited liability company (the "Company" and all of such membership interests in the Company, the "Membership Interests"); and

WHEREAS, pursuant to the terms and conditions of this Agreement, Seller desires to sell, transfer, convey, and assign to Buyer, and Buyer desires to acquire and assume the Membership Interests.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual representations, warranties, agreements, and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1 Definitions. Capitalized terms used in this Agreement but not defined elsewhere in the body of this Agreement have the meaning set forth in this Section.

"Accounting Firm" means the Dallas office of KPMG, or such other accounting firm as the Parties may mutually agree.

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, whether civil, criminal, administrative, regulatory or otherwise, and whether at law or in equity.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by, or under common Control with such Person. The Company shall be deemed to be (a) an Affiliate of Seller but not Buyer with respect to the period of time prior to Closing and (b) an Affiliate of Buyer but not Seller with respect to the period of time subsequent to Closing.

1

"Agreement" has the meaning ascribed to such term in the preamble to this Agreement.

"Akin" has the meaning ascribed to such term in Section 10.14.

"Assigned Contracts" has the meaning ascribed to such term in Section 6.4.

"Bridger Marks" has the meaning ascribed to such term in Section 2.2.

"Bridger Swan Ranch" has the meaning ascribed to such term in Section 6.4.

"Bridger Terminals" has the meaning ascribed to such term in Section 6.4.

"Business" means the business of the Company as described in the Ferrellgas PSA.

"Buyer" has the meaning ascribed to such term in the preamble to this Agreement.

"Buyer Indemnitees" has the meaning ascribed to such term in Section 8.1.

"Buyer Group" means James H. Ballengee, an individual, Ballengee Interests, LLC, a Louisiana limited liability company, JBAH Holdings, LLC, a Texas limited liability company, Jamex, LLC, a Delaware limited liability company, Buyer, and Jamex Marketing, LLC, a Louisiana limited liability company.

"Cap" has the meaning ascribed to such term in Section 8.7(b).

"Closing" has the meaning ascribed to such term in Section 2.1(a).

"Closing Date" has the meaning ascribed to such term in Section 2.1(a).

"Company" has the meaning ascribed to such term in the recitals.

"Contract" means any legally binding oral or written, without limitation, agreement, commitment, obligation, lease, license, or contract.

"Control," "Controlling," "Controlled By" or "under common Control" means, with respect to any Person, the possession, directly or indirectly (through one or more intermediaries), of the power to direct or cause the direction of the management, policies, or day-to-day business of such Person through the ownership of voting securities, by Contract, or otherwise.

"Direct Claim" has the meaning ascribed to such term in Section 8.3(c).

"Eddystone Agreement" means that certain Eddystone Rail Facilities Services Agreement dated February 14, 2013, by and between Bridger Transfer Services, LLC, as Customer, and Eddystone Rail Company, LLC, as Owner.

"Ferrellgas PSA" means that certain Purchase and Sale Agreement dated May 27, 2015, by and between Ferrellgas Partners, LP, as Purchaser, and Bridger, LLC, as Seller.

2

"Fraud" means, with respect to any Party, actual fraud involving a knowing or intentional misrepresentation of a fact with respect to the making by the applicable Party of any representation and warranty contained herein in ARTICLE 3, ARTICLE 4, and ARTICLE 5 with the intention that the other Party rely thereon to its detriment.

"Fundamental Representations" has the meaning ascribed to such term in Section 7.1.

"Indemnified Party" has the meaning ascribed to such term in Section 8.3.

"Indemnifying Party" has the meaning ascribed to such term in Section 8.3.

"Jamex TLA" means that certain Transportation and Logistics Agreement dated June 24, 2015, by and between Bridger Marketing, LLC, as Marketing, and Bridger Logistics, LLC, as Carrier, and any and all amendments, modifications, ratifications, and extensions thereof.

"Knowledge of Seller" means the actual knowledge of Julio Rios, Jeremy Gamboa, Todd Soiefer and Les Patterson, in each case after independent due inquiry by such individual.

"Later Discovered Property" has the meaning ascribed to such term in Section 6.3.

"Law" means any order, constitution, law, ordinance, regulation, statute or treaty of any governmental authority having jurisdiction over the subject matter thereof, any principle of common law, or any interpretation thereof by any governmental authority having jurisdiction over the subject matter thereof.

"Liabilities" or "Liability" means any duties, responsibilities, commitments, expenses, obligations, or liability (including indebtedness) in all cases of any kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Lien" means, with respect to any particular asset or all assets taken as a whole, in each case as the context requires, any encumbrance, charge, claim, equitable interest, convertible interest, lien (statutory or otherwise), option, warrant, pledge, condition, security interest, purchase right (including rights of first refusal or rights of first offer), mortgage, easement, encroachment, right of first refusal, conditional or installment sale agreements or other title acquisition or retention agreements, arrangements, or understandings, or any other similar restriction, limitation, or encumbrance, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership. Notwithstanding anything herein to the contrary, restrictions imposed upon securities under applicable state or federal securities laws shall be deemed not to be Liens hereunder.

"Loss" or "Losses" means losses, damages, Liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

3

"Material Adverse Effect" means any circumstance, change or effect, that is materially adverse to the business, operations (including results of operation), assets, Liabilities or condition (financial or otherwise) of the Business, excluding any circumstance, change or effect resulting or arising from (a) any change in general economic conditions in the industries or markets in which the Company operates or will operate, including any change in markets for commodities or supplies, transported, used or to be used in connection with the Business; (b) any change in general regulatory, social or political conditions, including any acts of war, sabotage or terrorist activities; (c) the implementation of, failure to implement, revocation, or alteration in any manner of, a market for Persons engaged in the Business by any governmental authority, irrespective of the form that such market may take; (d) any change in the financial, banking, credit, securities or capital markets (including any suspension of trading in, or limitation on prices for, securities on any stock exchange or any changes in interest rates) or any change in the general national or regional economic or financial conditions; (e) any change in any Law not contemplated prior to the date hereof; (f) any actions to be taken pursuant to or in accordance with this Agreement; and (g) the announcement of the execution of this Agreement or the transactions contemplated hereby; except in the case of the foregoing clauses (a), (b), (c), (d) and (e), to the extent that such matters have a disproportionally material adverse effect on the Business.

"Material Contract" or "Material Contracts" means any Contract or group of related Contracts (i) for the lease of real property, equipment or fixtures, (ii) that involves performance of services or delivery of goods or materials by the Company, or the receipt or purchase of good or services by the Company, (iii) concerning an investment or interest in a limited liability company, partnership, corporation, trust, joint venture, or similar arrangement; (iv) pursuant to which a Liability is created, incurred, assumed, or guaranteed any for borrowed money or any capitalized lease, or under which it has imposed an encumbrance on any assets of any type or character; (v) concerning confidentiality or purporting to limit the right of the Company to engage or compete in any line of business, save and except for this Agreement and the Ferrellgas PSA; (vi) any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other similar agreement for the benefit of its current or former directors, officers, and employees; (vii) concerning collective bargaining; (viii) concerning the employment of any individual on a full-time, part-time, consulting, or other basis or providing severance benefits; (ix) the performance of which involves actual cash payment or exchange of good or services with an approximate value in excess of One Thousand and No/100s Dollars ($1,000.00).

"Membership Interest Assignment" means the assignment of the Membership Interests in substantially the form attached hereto as Exhibit "A."

"Membership Interests" has the meaning provided to such term in the Recitals.

"Organizational Documents" means, with respect to any Person (a) that is a corporation, the articles and certificate of incorporation and bylaws thereof, or any comparable governing instruments, together with any other governing agreements or instruments of such corporation or the shareholders thereof, each as amended, (b) that is a limited

4

liability company, the certificate of formation and the operating agreement, limited liability company agreement or regulations of the limited liability company, or any comparable governing instruments, each as amended, (c) that is a partnership, the partnership agreement of the partnership and, if applicable, in the case of limited partnerships, the certificate of formation of the partnership and the Organizational Documents of such partnership's general partner, or any comparable governing instruments, each as amended and (d) that is any other Person, the organizational, constituent and/or governing documents and/or instruments of such Person.

"Party" and "Parties" have the meanings set forth in the preamble.

"Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union, or other entity or governmental authority.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period beginning the day after the Closing Date.

"Pre-Closing Taxes" means Taxes of the Company for any Pre-Closing Tax Period (not including any sales or transfer Tax or similar Tax imposed as a result of the transactions contemplated by this Agreement) and any penalties and interest with respect to such Taxes.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"Release Agreement" has the meaning ascribed to such term in Section 2.3(b).

"Representatives" means, as to any Person, its Affiliates and its and their respective governing persons, officers, employees, legal counsel, accountants, financial advisers, investors, lenders, consultants, and other agents.

"Retained Liabilities" means any asset, Contract (including the Eddystone Agreement and the other Contracts set forth on Schedule 4.4), Liability (including any Pre-Closing Tax liability), or obligation of any nature whatsoever of Seller, the Company, or their respective Affiliates, including as set forth on Schedules 3.5 and 4.6 hereof, to the extent relating to any period before the Closing, including any Liability or obligation that arises after the Closing with respect to any matter that occurred or accrued, or relates to the period, before the Closing. In addition, and notwithstanding the foregoing, it is agreed that the Assigned Contracts, and all Liabilities thereunder, are Retained Liabilities regardless of whether any such Liabilities thereunder arose prior to or on, or arises after, the Closing Date.

"Seller" has the meaning ascribed to such term in the preamble to this Agreement.

5

"Seller Indemnitees" has the meaning ascribed to such term in Section 8.2.

"Straddle Period" has the meaning ascribed to such term in Section 9.2.

"Tax" or collectively, "Taxes," means any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions thereto, and any Liability in respect of the foregoing payable by reason of contract, assumption, transferee liability, or operation of law.

"Tax Authority" means any governmental authority or any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"Tax Returns" means any report, return, election, document, estimated Tax filing, declaration or other filing provided to any Tax Authority or jurisdiction with respect to Taxes, including any amendments thereto.

"Terminal Logistics Services Agreement" means that certain Terminal Logistics Services Agreement by and between Company and Seller, dated effective as of February 1, 2016.

"Third Party Claim" has the meaning ascribed to such term in Section 8.3(a).

"Transaction Documents" means, collectively, this Agreement, the Exhibits and Schedules attached hereto, the Terminal Logistics Services Agreement, the Membership Interest Assignment, the Release Agreement, and all documents executed and delivered by any of the Parties in connection with any of the foregoing or the transactions described therein.

"Transfer Taxes" has the meaning ascribed to such term in Section 6.1.

1.2     Construction.

(a)     Each article, section, exhibit, annex and schedule reference are to those various Articles, Sections, Exhibits, Annexes and Schedules to this Agreement, respectively, unless otherwise stated. All Articles, Sections, Exhibits, Annexes and Schedules are attached hereto and made a part of this Agreement for all purposes.

(b)     Each Party agrees that it is represented by counsel during the negotiation and execution of this Agreement and ancillary and related documents and instruments, and that it has executed the same upon the advice of counsel. Each Party and its counsel have worked together in the preparation of this Agreement and such ancillary and related documents and instruments. All drafts related to the preparation of a final and definitive agreement of the Parties are hereby deemed by the Parties to be the work product of both Parties, and shall not be construed against a Party by reason or drafting history, preparation or negotiation.

6

(c)     Unless context requires otherwise, (i) proper nouns shall have the meaning ascribed to them in Section 1.1 of this Agreement, or as otherwise stated, unless no such meaning is ascribed, (ii) terms defined in the singular and plural have corresponding meanings regardless of use, (iii) masculine, feminine and gender-neutral terms shall have the same meanings, unless otherwise stated, (iv) references to days are to calendar days, unless otherwise stated, (v) reference to any document, agreement or instrument shall be deemed to include all amendments, modifications, ratifications and extensions thereof unless otherwise stated.

(d)     All references to price and currency herein are to United States Dollars (USD).

(e)     The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision unless expressly so limited. The words "this Article," "this Section," "this subsection," "this clause," and words of similar import, refer only to the Article, Section, subsection and clause hereof in which such words occur. The word "including" (in its various forms) means including without limitation. Unless expressly provided to the contrary herein, the word "or" is not exclusive. The words "day" or "days" shall mean calendar day. The words "will" and "will not" are expressions of command and not merely expressions of future intent or expectation. When used in this Agreement, the word "either" shall be deemed to mean "one or the other", not "both."

## ARTICLE 2
## PURCHASE AND SALE

2.1     Closing; Transfer of Membership Interests.

(a)     The transactions contemplated by this Agreement will be consummated (the "Closing") at 10:00 a.m., Dallas, Texas time, at the offices of Seller, located at 2009 Chenault Drive, Suite 100, Carrollton, Texas 75006, on the date hereof or such other time as the Parties may agree. The date on which the Closing occurs is referred to herein as the "Closing Date"; provided that the Closing shall be effective solely for accounting purposes (including with respect to accruals incurred in the ordinary course of business under the Eddystone Agreement) as of 12:00 a.m., Dallas, Texas time, on February 1, 2016.  All proceedings to be taken and all documents to be executed and delivered by all Parties at the Closing will be deemed to have been taken and executed simultaneously, and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed, and delivered.

(b)     At the Closing, Seller shall sell, assign, transfer, convey, deliver, and set over to Buyer the Membership Interests free and clear of any and all Liens.  The purchase and sale of the Membership Interests, and Buyer's consequent ownership of the Company, excludes the Retained Liabilities.  The transfer of the Membership Interests contemplated by the immediately preceding sentence shall be effectuated at Closing pursuant to the Membership Interest Assignment attached hereto as Exhibit "A."  At the Closing, Buyer will accept such assignment and transfer of the Membership Interests from Seller on the

7

terms and conditions set forth herein, including the assumption of Liabilities under the Eddystone Agreement and the Contracts set forth on Schedule 4.4 for periods on and after the Closing Date.

(c)     At the Closing, the Parties shall execute, and deliver to the other, this Agreement and the other Transaction Documents (other than the Membership Interest Assignment, which is to be delivered as set forth in subsection (b) of this Section 2.1).

2.2     Reservation of Bridger Marks.  Notwithstanding anything contained herein to the contrary, Seller expressly reserves, and does not transfer or assign any right, title, or interest in or to the "Bridger" name or mark, including, without limiting the generality of the foregoing, the "Bridger" name and logo and any and all variations or derivations of such name and logo, and related or similar trade names, trademarks, service marks, or logos to which any Affiliate of Seller holds rights (the "Bridger Marks"). Immediately after Closing, Buyer will (a) cause the Company to change its name in respect of the rights of Seller in and to the Bridger Marks (*i.e.*, such new name shall not include "Bridger" or any term similar thereto) and (b) deliver, or permit the Seller to cause to be delivered, the Notice of Change in Name attached hereto as Exhibit "C".

2.3     Consideration.

(a)     Payment of Funds.  At the Closing, as consideration for the transactions contemplated by Section 2.1(b), and elsewhere herein, Buyer will tender and pay or cause to be tendered and paid the sum of Ten and No/100s Dollars ($10.00) to Seller at a bank of Seller's designation.

(b)     Execution of Release.  At the Closing, as consideration for the transactions contemplated by Section 2.1(b) and elsewhere herein, Seller shall execute and deliver the Release Agreement attached hereto as Exhibit "B."

(c)     Payment of Invoices.  As consideration for the transactions contemplated by Section 2.1(b) and elsewhere herein, subsequent to Closing, Seller hereby covenants and agrees to tender and pay to Buyer, for the benefit of the Company, Four Million Four Hundred Forty Seven Thousand Six Hundred Seventy Seven Dollars and 96/100 ($4,447,677.96) in satisfaction of all charges and sums actually due under invoices issued in the ordinary course of business pursuant to the Eddystone Agreement that are incurred during the period for the month of January 2016, as such sums and charges become due and payable on or about February 20, 2016 (in accordance with the terms of the Eddystone Agreement); provided, however, any penalties, fees, costs, expenses, Losses, or other obligations or liabilities under the Eddystone Contract that arise on or after the Closing Date due to the aforestated amount not having been paid by Seller to Buyer pursuant to the terms of this Section 2.3(c) shall be the sole responsibility of Seller, and shall be a Retained Liability.  For the purposes of clarity, the obligation of Seller under this Section 2.3(c) relates solely and exclusively to charges and sums incurred in the ordinary course of business pursuant to the terms of the Eddystone Agreement.

(d)     Limited Waiver of Jamex TLA Non-compete.  As consideration for the transactions contemplated by Section 2.1(b) and elsewhere herein, Seller hereby consents

8

to Buyer Group and each of such group's respective Affiliates utilizing the Company as a provider of all those certain transportation and logistics services as and to the extent expressly described in the Eddystone Agreement, and Seller does hereby waive Section 2(c) of the Jamex TLA solely with respect to the Eddystone Agreement and solely to the extent necessary to give effect to the foregoing consent in this Section 2.3(d), such consent being subject to Seller's written consent to any assignment, amendment, modification, extension or ratification of the Eddystone Agreement, in each case, as contemplated by Section 2.3(f) hereof. Notwithstanding anything contained in this Section 2.3(d) to the contrary, (i) Seller's consent provided for in the first sentence of this Section 2.3(d) is expressly limited to the term of the Eddystone Agreement (*i.e.*, such consent shall be deemed automatically revoked upon the earlier expiration or termination of the Eddystone Agreement), (ii) subject to the immediately preceding clause (i), Seller reserves all rights contemplated by the Jamex TLA, and (iii) save and except for the previous sentence, Seller does not consent to Buyer Group or any of such group's respective Affiliates utilizing any other providers of transportation and logistics services for any crude petroleum pursuant to Section 2(a) of the Jamex TLA or otherwise.

(e)     Limited Waiver of Ferrellgas PSA Non-compete.  As consideration for the transactions contemplated by Section 2.1(b) and elsewhere herein, Ferrellgas Partners, LP (the beneficial and pecuniary owner an undivided ninety-nine percent (99%) interest in Seller) hereby consents to Buyer Group and each of such group's respective Affiliates owning, acquiring, managing, operating, controlling, or participating in the ownership, management, operation, and control of Company solely to the extent in connection with its performance of its or Buyer's obligations under the Eddystone Agreement, and Seller does hereby agree to waive Section 6.10(a) of the Ferrellgas PSA and Section 1 of the Non-Competition Letter Agreement from James Ballengee to Ferrellgas Partners, LP dated May 29, 2015 solely with respect to Company's or Buyer's performance of the Eddystone Agreement and solely to the extent required to give effect to the foregoing consent in this Section 2.3(e), such consent being subject to Seller's written consent to any assignment, amendment, modification, extension or ratification of the Eddystone Agreement, in each case, as contemplated by Section 2.3(f) hereof. Notwithstanding anything contained in this Section 2.3(e) to the contrary, (i) subject to the limited waiver by Ferrellgas Partners, LP of Section 6.10(a) of the Ferrellgas PSA and Section 1 of the Non-Competition Letter Agreement from James Ballengee to Ferrellgas Partners, LP dated May 29, 2015 expressly provided for in this Section 2.3(e), Ferrellgas Partners, LP reserves all rights pursuant to the Ferrellgas PSA and nothing herein shall be construed to derogate from any such rights, and (ii) save and except for the previous sentence, Ferrellgas Partners, LP does not consent to Buyer Group owning, acquiring, managing, operating, controlling or participating in the ownership, management, operation, or control of any business that competes with the Business other than solely as a result of the Company's or Buyer's performance of the Eddystone Agreement.

(f)     No Amendment of Eddystone Agreement.  As consideration for the transactions contemplated by Section 2.1(b) and elsewhere herein, and notwithstanding anything contained in this Section 2.3 to the contrary, Buyer shall not, and shall not permit the Company to, amend, modify, extend, or ratify the Eddystone Agreement without the express, prior written consent of Seller, which consent may be granted or denied in the

sole and absolute discretion of Seller, if such amendment, modification, extension, or ratification would, as written, directly or indirectly have the likely effect of expanding the nature or scope of the waivers granted in Sections 2.3(d) or (e). For avoidance of doubt, Seller acknowledges and agrees that Buyer may, without the requirement of any further consent of Seller, amend, modify, extend, or ratify the Eddystone Agreement if such amendment, modification, extension, or ratification, as written, would not be reasonably expected to expand the nature or scope of the waivers granted in Sections 2.3(d) and (e). For the purposes of clarity and notwithstanding anything herein to the contrary, the Parties agree that the waivers contemplated in Sections 2.3(d) and (e) are intended to be, and shall be construed to be, applicable with respect to the scope and nature of activities set forth in terms of the Eddystone Agreement as in effect immediately prior to Closing. In furtherance of the foregoing, the Parties agree that the waivers contemplated by Sections 2.3(d) and (e) shall apply (and shall be deemed to apply) to the terms of the Terminal Logistics Services Agreement to the extent such waivers are necessary to enable the Company to perform its obligations under the Terminal Logistics Services Agreement without causing a violation by Buyer Group of the restrictive covenants contemplated by Section 2.3(d) or (e).

2.4     Transaction Expenses.  Each Party to this Agreement and the Transaction Documents shall bear its own fees, costs, and expenses of any financial advisors, consultants, attorneys, or other Representatives engaged by such Party or its Representatives and payable by such Party in connection with the structuring, negotiation, or consummation of the transactions contemplated by this Agreement or any of the other Transaction Documents, which, in each case, are unpaid as of the Closing.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer on and as of the Closing that, except as otherwise stated herein or on the Schedules, the following are true, correct, and complete:

3.1     Organization.  Seller is a limited liability company duly organized pursuant to the Laws of the State of Louisiana.  Seller is in good standing pursuant to the Laws of the State of Louisiana, and has all requisite organizational power and authority to conduct its business as presently conducted by it.  Seller is in good standing in all other jurisdictions in which the ownership of its assets or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by the Transaction Documents to which Seller is a party, or to impair Seller's ability to perform its obligations under the Transaction Documents to which Seller is a party.

3.2     Authorization.  Seller has all requisite power and authority to execute and deliver each of the Transaction Documents to which it is a party and to consummate and perform the transactions contemplated hereby and thereby.  The execution and delivery of the Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite limited liability company action on the part of Seller. The Transaction Documents to which Seller is a party have

10

4.11     Assets.  The Company has no assets other than the Eddystone Agreement and the other Contracts set forth on Schedule 4.4, and owns 100% of all right, title, and interest in and to the Eddystone Agreement and the other Contracts set forth on Schedule 4.4 (excluding the rights and interests of the counterparty to such agreements).  No Person other than the Company has, has had, has the right to, or has any claim against, all or any portion of the Company's right, title, or interest in, to, or under such agreements. The Company has no interest of any nature in any real property, except as lessee under the leases contemplated by the Transportation Logistics Services Agreement, which leases are also set forth on Schedule 4.4.  The Company does not own, license, or lease any intellectual property of any nature.

4.12     Powers of Attorney.  The Company has no outstanding powers of attorney.

# ARTICLE 5
# REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller on and as of the Closing that the following are true, correct, and complete:

5.1     Organization.  Buyer is a limited liability company duly organized pursuant to the Laws of the State of Texas. Buyer is in good standing pursuant to the Laws of the State of Texas, and has all requisite organizational power and authority to conduct its business as presently conducted by it. Buyer is in good standing in all other jurisdictions in which the ownership of its assets or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by the Transaction Documents to which Buyer is a party, or to impair Buyer's ability to perform its obligations under the Transaction Documents to which Buyer is a party.

5.2     Authorization.  Buyer has all requisite power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate and perform the transactions contemplated hereby and thereby. The execution and delivery of the Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite action on the part of Buyer. The Transaction Documents to which Buyer is a party have been duly and validly executed and delivered by Buyer, and, assuming the due authorization, execution and delivery by the other parties thereto, each Transaction Document to which Buyer is a party constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

5.3     Independent Evaluation.  Buyer is sophisticated in the evaluation, purchase, development, ownership, and operation of businesses and assets similar to the Business and assets of the Company. In making its decision to enter into this Agreement and consummate the transactions contemplated herein, Buyer has conducted its own independent investigation and evaluation of the Company, the Business and the assets thereof, and has received advice from competent advisors, lawyers, and accountants. In respect of this Agreement and the transactions contemplated hereby, except for the representations and warranties herein or in any other Transaction Document, Buyer has not relied on any comments, statements, reports, projects, or other documents or materials provided by or for Seller or its agents.

16

EXHIBIT B

# RELEASE AND GUARANTEE AGREEMENT

**THIS RELEASE AND GUARANTEE AGREEMENT** (this "*Agreement*"), dated as of February ___, 2016, is made by and between Jamex Marketing, LLC ("*Jamex*") and Bridger Logistics, LLC ("*Bridger*"). Jamex and Bridger are herein referred to from time to time as the "*Parties*" and each, individually, as a "*Party*".

## RECITALS

WHEREAS, the Parties entered into that certain letter agreement dated as of January 13, 2016 (the "*Letter Agreement*");

WHEREAS, among other transactions, the Letter Agreement contemplates that Bridger shall sell, transfer, convey and assign to Jamex, and that Jamex shall purchase and receive from Bridger, the equity interests held by Bridger in Bridger Transfer Services, LLC ("*BTS*", and the definitive agreement pursuant to which the equity interests in BTS held by Bridger will be transferred to Jamex, the "*BTS Transfer Document*");

WHEREAS, in connection with the transactions contemplated by the BTS Document (which is hereby acknowledged and agreed to be that certain Purchase and Sale Agreement by and between Bridger and Jamex Transfer Holdings, LLC ("*Buyer*") dated as of even date herewith), Buyer, a newly formed, wholly owned subsidiary of Jamex will, after the consummation of the transactions contemplated by the BTS Transfer Document, be the record holder of 100% of the issued and outstanding equity interests of BTS;

WHEREAS, as a material inducement to enter into the BTS Transfer Document, Jamex agrees to cause Buyer to fulfill its obligations under the BTS Transfer Document and to guarantee payment of any amounts payable thereunder by Buyer in favor of Bridger;

WHEREAS, contemporaneously with the execution of this Agreement and the BTS Transfer Document, Jamex is receiving good and valuable consideration in exchange for Jamex's relinquishment of certain Claims (as defined herein) contemplated herein; and

WHEREAS, Jamex acknowledges that Bridger is relying on this Agreement in connection with Bridger's execution and delivery of the BTS Transfer Document.

NOW THEREFORE, in consideration for the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby covenant and agree as follows:

## AGREEMENT

1. <u>Release by Jamex</u>. Effective as of consummation of the transfer of the equity interests in BTS to Buyer pursuant to the BTS Transfer Document (the "*Closing*"):

(a) Subject to <u>Section 1(d)</u> below, Jamex does hereby finally, unconditionally, irrevocably, and absolutely release, acquit, remise, and forever discharge Bridger and each of its past, present, and future shareholders, directors, officers, partners, managers, members,

1

Affiliates, employees, counsel, agents, representatives, and contractors and each of their respective successors and assigns (individually, a "**Releasee**" and, collectively, the "**Releasees**") from any and all accounts, agreements (including, but not limited to, any rights to indemnification, reimbursement, or compensation from any Releasee, whether pursuant to any contract, law, arrangement, commitment, undertaking or otherwise, and whether written or oral and whether or not relating to claims pending on, or asserted after, the Closing), avoidance actions, bills, bonds, causes, causes of action, charges, claims, complaints, contracts, controversies, costs, counterclaims, damages, debts, demands, equitable proceedings, executions, expenses, legal proceedings, liabilities, losses, matters, objections, obligations, orders, proceedings, reckonings, remedies, rights, setoffs, suits, and sums of money, of any kind, whether any of the foregoing exist at common law, exist by statute, or otherwise, and whether known or unknown, whether matured or unmatured, whether absolute or contingent, whether direct or derivative, whether suspected or unsuspected, and whether liquidated or unliquidated, in each case to the extent, but only to the extent, such arises directly or indirectly out of the sale of BTS to Buyer (each, a "**Claim**," and collectively, the "**Claims**"), including, but not limited to, any claims for breach of contract, breach of any special relationship, breach of duty of care, breach of duty of loyalty, breach of fiduciary duty, concealment, conflicts of interest, conspiracy, control, course of conduct or dealing, debt recharacterization, deceit, deceptive trade practices, deepening insolvency, defamation, disclosure, duress, economic duress, equitable subordination, fraud, fraudulent conveyance, fraudulent transfer, gross negligence, insolvency law violations, interference with contractual and business relationships, misrepresentation, misuse of insider information, negligence, breach of obligation of fair dealing, breach of obligation of good faith and fair dealing, breach of obligation of good faith, preference, secrecy, securities and antitrust laws violations, substantive consolidation, tying arrangements, unconscionability, usury, violations of statutes and regulations of governmental entities, instrumentalities and agencies, wrongful recoupment or setoff, or any tort, whether common law, statutory, or in equity, and including as a result of, or in relation to, any negligence of any Releasee; provided, however, that the releases herein made by Jamex shall not in any manner derogate from or be deemed to derogate from (i) the representations, warranties, covenants, and agreements made by Bridger to Buyer under the BTS Transfer Document and the other Transaction Documents (as such term is defined in the BTS Transfer Document), or (ii) the rights and remedies of Buyer or any Buyer Indemnitee under the BTS Transfer Document and the other Transaction Documents, as applicable.

(b) Except as otherwise provided for herein, Jamex, or Jamex on behalf of Buyer, hereby irrevocably waives and covenants and agrees to forbear and refrain from, directly or indirectly, asserting any Claim, or commencing, instituting, or causing to be commenced or instituted, any legal, arbitral, or equitable proceeding of any kind (whether actual, asserted or prospective) against any Releasee based upon any matter released pursuant to this Agreement.

(c) Without in any way limiting any of the rights and remedies otherwise available to any Releasee, Jamex shall indemnify and hold harmless each Releasee from and against all liabilities, claims, damages, and expenses (including reasonable attorneys' fees), whether or not involving third-party claims, arising directly or indirectly from or in connection with the assertion by or on behalf of Jamex of any Claim.

2

(d) The Parties agree that the Claims expressly set forth on Schedule 1 (and only to the extent set forth on Schedule 1) are not Claims that are being released pursuant to this Agreement and Section 1(a) specifically.

2. Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal,, or unenforceable in any respect in any jurisdiction under any applicable law, such invalidity, illegality, or unenforceability shall not affect the validity, legality, or enforceability of any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed, and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal, or unenforceable provision.

3. Successors and Assigns; Third Party Beneficiaries. The obligations of any Party under this Agreement may not be assigned without the prior written consent of the other Party, and any purported assignment in violation of the foregoing shall be void *ab initio*. Subject to the immediately preceding sentence, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement is intended or shall be construed to confer upon any Person other than the Parties, the Releasees, and their respective successors and permitted assigns any right, remedy, or claim under or by reason of this Agreement.

4. Guarantee.

(a) Effective as of the date hereof, Jamex hereby absolutely, unconditionally, and irrevocably guarantees each and every representation, warranty, covenant, agreement and other obligation of Buyer, and the full and timely payment and prompt and complete performance of Buyer's obligations and liabilities, under the provisions of BTS Transfer Document (collectively, the "***Guaranteed Obligations***"). Jamex acknowledges that it is making the guarantee contemplated in this Section 4 (the "***Guarantee***") to induce Bridger to enter into the BTS Transfer Document.

(b) The Guarantee is an absolute, unconditional, and continuing guarantee of the full and timely payment and performance of the Guaranteed Obligations, and not of collection. Should Buyer default in the payment of any of its payment obligations under the BTS Transfer Document, the corresponding Guaranteed Obligations hereunder shall become immediately due and payable by Jamex to Bridger. Claims hereunder may be made on one or more occasions. In the event that any payment to Bridger in respect of any Guaranteed Obligation is rescinded and/or returned to Jamex for any reason whatsoever, Jamex shall remain liable hereunder with respect to the Guaranteed Obligation as if such payment had not been made.

(c) For the purposes of clarity, to the fullest extent permitted by law, the continuing validity and enforceability of the Guarantee will not be affected by (i) any amendment or restatement of, supplement to, or modification or waiver of or consent to any departure from the BTS Transfer Document or the documents entered into in connection therewith that may be agreed to by Buyer, (ii) any release or discharge of any obligation of Buyer contained in the BTS Transfer Document resulting from any change in the existence,

3

structure, or ownership of Buyer, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting Buyer, (iii) the addition, substitution, or release of any Person primarily or secondarily liable for any Guaranteed Obligation, (iv) any other act or omission that may or might in any manner or to any extent vary the risk of Jamex or otherwise operate as a discharge of Jamex as a matter of law or equity, (v) the existence of any claim, set-off, or other right that Jamex may have at any time against Buyer or Bridger, whether in connection with the Guaranteed Obligations or otherwise, or (vi) the adequacy of any other means Bridger may have of obtaining the payment of the Guaranteed Obligations.

(d) Jamex hereby waives, to the fullest extent permitted by law, for the benefit of Bridger (i) any right to require Bridger, as a condition of payment or performance hereunder by Jamex, to proceed against Buyer or any other Person primarily or secondarily liable for any Guaranteed Obligation or pursue any other remedy whatsoever, (ii) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate Jamex or sureties, and (iii) promptness, diligence, notice of the acceptance of the Guarantee and of any Guaranteed Obligations, presentment, demand for payment, notice of non-performance, default, dishonor, and protest, notice of the incurrence of any Guaranteed Obligation and all other notices of any kind, all defenses which may be available by virtue of any valuation, stay, moratorium law, or other similar law now or hereafter in effect, any right to require the marshaling of assets of Buyer or any other Person interested in the transactions contemplated by the BTS Transfer Document, and all suretyship defenses generally (other than actual fraud by Bridger). Notwithstanding any waiver of defenses contemplated by the Guarantee, Jamex shall have the right to avail itself of any and all rights of Buyer to the extent expressly set forth in the BTS Transfer Document.

(e) Without limiting in any way the Guarantee, Jamex covenants and agrees to take all actions to cause and enable Buyer to comply with its obligations under the BTS Transfer Document that require action on the part of Buyer or any of its Affiliates to enable Buyer to comply with its obligations under the BTS Transfer Document.

(f) The Guaranteed Obligations, and each of them, shall conclusively be deemed to have been created, contracted, or incurred in reliance upon the Guarantee, and all dealings between Buyer or Jamex, on the one hand, and Bridger, on the other hand, in connection with the Guaranteed Obligations shall likewise be conclusively presumed to have been had or consummated in reliance upon the Guarantee.

5. <u>Representations and Warranties</u>.

(a) Jamex is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization.

(b) Jamex has the limited liability company power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Jamex of this Agreement and the consummation by Jamex of the transactions contemplated hereunder have been duly authorized by all necessary action on the part of Jamex. Jamex is the legal and beneficial owner of all of the issued and outstanding equity securities of Buyer.

4

SCHEDULE 4.4

CONTRACTS

1. The Eddystone Agreement.

2. Assignment and Assumption Agreement dated effective January 31, 2016 at 11:59 p.m. CST from Bridger Transfer Services, LLC, as assignor, to Bridger Terminals, LLC, as assignee.

3. Assignment and Assumption Agreement dated effective January 31, 2016 at 11:59 p.m. CST from Bridger Transfer Services, LLC, as assignor, to Bridger Swan Ranch, LLC, as assignee.

4. General Warranty Deed dated effective January 31, 2016 at 11:59 p.m. MST from Bridger Transfer Services, LLC, as grantor, to Bridger Swan Ranch, LLC, as grantee, recorded in the Official Records of the County Clerk, Laramie County, Wyoming.

5. Truck Station Lease Agreement—Berthold Station dated December 1, 2010, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

6. Truck Station Lease Agreement—Stanley Station (Lot 3A) dated December 1, 2010, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

7. Truck Station Lease Agreement—Stanley Station (Lot 3B) dated December 1, 2010, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

8. Truck Station Lease Agreement—Beaver Lodge Station dated September 1, 2011, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

9. Truck Station Lease Agreement—Reserve Station dated October 1, 2011, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

10. Truck Station Lease Agreement—Alexander Station dated November 1, 2011, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and

any and all amendments, modifications, extensions and ratifications thereof.

11. Truck Station Lease Agreement—Trenton Station dated November 1, 2011, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

12. Truck Station Lease Agreement—Gerona Station dated November 22, 2012, by and between Enbridge Pipelines (North Dakota) LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

13. Truck Station Lease Agreement—Little Muddy Station dated November 22, 2012, by and between Enbridge Pipelines (North Dakota), LLC and Bridger Transfer Services, LLC, and any and all amendments, modifications, extensions and ratifications thereof.

14. Connection Agreement dated March 17, 2014 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering crude pipeline connections to the Cline Shale System in Sterling and Irion Counties, Texas.

15. License Agreement dated March 17, 2014 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering the Barnhart WTI Station in Irion County, Texas.

16. Connection Agreement dated April 15, 2014 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering crude pipeline connections to the Centurion System in Scurry County, Texas.

17. License Agreement dated April 15, 2014 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering the Bridger Transfer Services WTI Station in Scurry County, Texas.

18. License Agreement dated December 7, 2011 by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering the Midland Sweet Station in Midland County, Texas.

19. Truck Station Connection Agreement dated December 7, 2011, by and between Centurion Pipeline LP and Bridger Transfer Services, LLC, covering crude pipeline connections to the Centurion System in Midland County, Texas.