UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------
EDDYSTONE RAIL COMPANY, LLC,

        *Petitioner*,

        -against-

JAMEX TRANSFER SERVICES, LLC,

        *Respondent*.
------------------------------------------------------

17cv1266

OPINION & ORDER

WILLIAM H. PAULEY III, United States District Judge:

        Bridger Logistics, LLC ("Bridger Logistics"), Ferrellgas Partners, L.P. and Ferrellgas L.P. (together, "Ferrellgas"), and Julio Rios and Jeremy Gamboa (the "Officers") (collectively, the "Proposed Intervenors") move to intervene in this action.

        The Proposed Intervenors seek intervention to challenge an arbitration award against Jamex Transfer Services ("JTS") that they fear may be enforced against them. This is because Ferrellgas once owned Bridger Logistics, and the Officers operated its subsidiary, Bridger Transfer Services ("BTS"). After Bridger Logistics sold BTS to Jamex Transfer Holdings LLC ("Jamex Holdings"), Jamex Holdings changed BTS's name to JTS. The Proposed Intervenors contend that their affiliation with BTS—before it was renamed JTS—gives them an interest in the underlying subject matter of this proceeding.

        Now, nearly a year and a half after the sale of BTS, Petitioner Eddystone Rail Company, LLC ("Eddystone") seeks to convert a $139 million arbitration award against JTS into a judgment. The Proposed Intervenors' concern that Eddystone will attempt to enforce any judgment here against them may not be far-fetched. Indeed, Eddystone filed a separate lawsuit against the Proposed Intervenors in the Eastern District of Pennsylvania (the "Pennsylvania

Action"), alleging that they stripped BTS of its assets before orchestrating a sham transaction in which Jamex Holdings, a shell company, agreed to take BTS off their hands and rename it JTS. If Eddystone prevails on its theory that the Proposed Intervenors are JTS's alter egos in the Pennsylvania Action, Eddystone might move one step closer to enforcing a confirmed arbitration award against the Proposed Intervenors. Faced with the specter that they will be left holding the proverbial $139 million bag, the Proposed Intervenors seek to intervene in this action to challenge and vacate the arbitration award. For the reasons that follow, the Proposed Intervenors' motion is denied.

BACKGROUND

This action stems from Eddystone's petition to confirm an award obtained in arbitration against JTS (the "Petition"). Shortly after Eddystone filed the Petition, the Proposed Intervenors filed pre-motion conference letters seeking leave to intervene for the limited purpose of opposing confirmation of the Petition. (See ECF Nos. 9 and 10.)

I. The Agreement

Eddystone owns a rail terminal in Eddystone, Pennsylvania with docks on the Delaware River. (Petition to Confirm Arbitration Award, ECF No. 1 ("Petition"), ¶ 6.) In February 2013, Eddystone entered into a rail facilities services agreement (the "Agreement") with BTS. (Petition ¶ 6.) Under the Agreement, Eddystone committed to building a facility for the transshipment of crude oil from rail cars to barges on the Delaware River over a five-year period. (Petition ¶ 6.) In exchange, BTS agreed to bring a certain minimum volume of crude oil to Eddystone's facility for transloading each month, or to pay a deficiency fee for each barrel short of the minimum volume requirement. (Petition ¶ 6.) At the time of the Agreement, BTS was a subsidiary of Bridger Logistics.

II.     Bridger Logistics' Sale of BTS to Jamex Holdings

In June 2015, Ferrellgas agreed to acquire Bridger Logistics and BTS for approximately $837.5 million.[1]  Less than a year later, by a purchase and sale agreement dated February 22, 2016, Bridger Logistics transferred BTS to non-party Jamex Holdings, which renamed it JTS.  Under the terms of the sale, Bridger Logistics agreed to provide more than $4 million to Jamex Holdings to cover all outstanding amounts due to Eddystone through the effective date of sale.  In exchange, Jamex Holdings acknowledged that it would assume all post-closing obligations to Eddystone.  In addition, Jamex Holdings' parent company, Jamex Marketing LLC, agreed to guarantee those obligations.  (Declaration of David M. Zensky in Support of Motion to Intervene, ECF No. 32, Ex. C §§ 2.1(b), 2.3(c), 4–5.)

III.    Breach of the Agreement and the Ensuing Arbitration

Shortly after the sale, JTS allegedly breached the Eddystone Agreement. Eddystone asserts that JTS stopped bringing trains with oil shipments to Eddystone's transloading facility and ceased making deficiency payments.  (Petition ¶ 8.)

In April 2016, pursuant to the terms of the Agreement, Eddystone commenced an arbitration against JTS seeking $3.87 million in damages.  In June 2016, JTS responded with a statement of defenses to Eddystone's claims and asserted counterclaims against Eddystone for fraud, fraudulent inducement, negligent misrepresentation, and breach of contract.  Later that month, Eddystone presented its case-in-chief before the arbitration panel.  (Petition ¶ 9.)  Shortly thereafter, the parties agreed to recess the arbitration until February 2017 to conduct additional

---

[1] "Ferrellgas to buy Bridger Logistics in $837.5 million deal," REUTERS, June 1, 2015, https://www.reuters.com/article/us-bridger-m-a-ferrellgas-part/ferrellgas-to-buy-bridger-logistics-in-837-5-million-deal-idUSKBN0OH2CS20150601.

discovery.  In the meantime, JTS supplemented its counterclaims, seeking damages in excess of $11 million.  Eddystone also raised its damages demand, seeking hundreds of millions of dollars for the loss of future deficiency payments through June 2019.

With discovery underway in the summer of 2016, Eddystone served a subpoena on Ferrellgas for documents in aid of arbitration.  Based on Ferrellgas's apparent refusal to comply, Eddystone initiated an August 2016 miscellaneous action in this District to enforce the subpoena.  (See Eddystone Rail Co. v. Ferrellgas Partners, 16mc0295 (S.D.N.Y. Aug. 10, 2016) ("Subpoena Action").)  Ultimately, the parties reached a stipulation, with Ferrellgas agreeing to "search for production documents" and "work in good faith towards substantial completion of its document production."  (Subpoena Action, ECF No. 21 at 2–3.)  By then, Ferrellgas had discerned an apparent purpose behind the arbitration, telling the District Judge that Eddystone's demand for documents was "plainly an effort by [Eddystone] to obtain discovery from non-party [Ferrellgas] to build a separate lawsuit against [Ferrellgas]."  (Subpoena Action, ECF No. 6 at 1.)

By December 2016, the parties reached a settlement in principle resolving the arbitration, with JTS stipulating to liability and the full amount of damages sought by Eddystone.  JTS also consented to entry of an arbitration award.  Based on the settlement agreement, the arbitration panel awarded Eddystone approximately $139 million in damages and found that JTS "materially breached and anticipatorily repudiated the [Agreement]."  (Petition ¶ 10.)

IV.   Eddystone's Action Against the Proposed Intervenors

In February 2017, Eddystone commenced the Pennsylvania Action against the Proposed Intervenors.  In sum, Eddystone alleges there that the Proposed Intervenors were alter egos of BTS, and should be held responsible for approximately $140 million, the cost of building the transloading facility under the Agreement.  (See, e.g., Eddystone Rail Co., LLC v. Bridger

Logistics, LLC, 17cv0495 (E.D. Pa. Feb. 2, 2017) ("Pennsylvania Action"), ECF No. 1 at ¶¶ 7–10, 63–64.) Eddystone posits that the Proposed Intervenors stripped BTS of its assets before transferring it to Jamex Holdings, violating applicable fraudulent transfer laws and the fiduciary duties they owed to BTS's creditors.

V. Eddystone's Petition to Confirm the Arbitration Award

In February 2017, Eddystone also commenced this action to obtain judicial confirmation of the Arbitration Award and convert it into a judgment. On February 22, 2017, this Court scheduled a telephone conference to fix a briefing schedule regarding Eddystone's anticipated motion to confirm its Petition. (ECF No. 7.) Just a week later, however, the Proposed Intervenors filed their respective pre-motion conference letters seeking leave of court to intervene. (ECF Nos. 9 and 10.)

The Proposed Intervenors seek to intervene to oppose confirmation of the Petition. They contend that the Arbitration Award is the product of collusive litigation, in which Eddystone and JTS both knew that JTS had nothing to lose by capitulating to Eddystone's demands. According to the Proposed Intervenors, Eddystone will seek to enforce any arbitration award against them, and not JTS. The Proposed Intervenors, however, claim that they were never aware of the arbitration, and even if they were, had no reason to intervene in that proceeding because the contractual breach arose after they sold BTS to Jamex Holdings.

DISCUSSION

I. Standing to Intervene

This Court is confronted with a threshold question of whether a non-party to an underlying arbitration may intervene in a federal proceeding for the purpose of challenging the validity of an arbitration award. The Proposed Intervenors argue that because they have a

5

substantial interest in this action—namely, protecting their interest against the enforcement of a purported sham arbitration award—they are entitled to intervene as real parties in interest. (Proposed Intervenors' Memo. of Law in Support of Motion to Intervene, ECF No. 31 ("Mot."), at 8; Proposed Intervenors' Reply in Support of Motion to Intervene, ECF No. 43 ("Reply"), at 4–5.) Eddystone counters that because only a party to an arbitration may seek vacatur of an arbitration award, the Proposed Intervenors lack standing to challenge the award. (Eddystone's Memo. of Law in Opposition to Motion to Intervene, ECF No. 37 ("Opp."), at 9.)

Any analysis regarding the Proposed Intervenors' standing to intervene and seek vacatur of the Arbitration Award begins with the text of the Federal Arbitration Act ("FAA"). The FAA provides that a court may vacate an arbitration award "upon the application of any party to the arbitration." 9 U.S.C. § 10(a). Under the plain terms of the FAA, the Proposed Intervenors are foreclosed from challenging the Arbitration Award. Meshkin v. Vertrue Inc., 2007 WL 2462172, at *1 (D. Conn. Aug. 28, 2007) (in interpreting FAA § 10, "[t]his means that a non-party to the arbitration may not seek to overturn its outcome"); Katir v. Columbia Univ., 821 F. Supp. 900, 901 (S.D.N.Y. 1993) ("Because [the plaintiff] was not a party to the arbitration, she lacks standing to petition to vacate the Award."); Dundas Shipping & Trading Co., Ltd. v. Stravelakis Bros., Ltd., 508 F. Supp. 1000, 1003 (S.D.N.Y. 1981) ("Since [co-petitioner] was not a party to the arbitration, it has no standing to move to vacate the award.").

Notwithstanding that general rule, the Proposed Intervenors cite to a 1988 Second Circuit opinion they claim "directly considered—and rejected—the argument that non-parties to an arbitration lack standing to seek vacatur of an arbitration award as intervenors." (Mot. at 8 (citing Ass'n of Contracting Plumbers of City of N.Y., Inc. v. Local Union No. 2 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. ("Contracting Plumbers"), 841

6

F.2d 461 (2d Cir. 1988)).) Contracting Plumbers considered "whether under § 10 [of the FAA], a district court may entertain the motion of a non-party to set aside an arbitration award." 841 F.2d at 467. That case involved a dispute between the plumbers union and the pipefitters union regarding which group had the exclusive right to install combination standpipe-sprinkler risers in New York City buildings. The parties initially submitted their dispute to an internal grievance committee pursuant to a procedure outlined by the union association (the "Association") to which each of them belonged. After a drawn out internal process awarded the disputed work to the pipefitters union, the plumbers union invoked the arbitration clauses in their respective collective bargaining agreements without informing the pipefitters union or the Association about such arbitrations. Because they were never notified of these arbitrations, both the pipefitters union and the Association never sought to intervene in those proceedings.

At arbitration, the plumbers union obtained favorable decisions. The pipefitters union and the Association only learned of these results when the plumbers union sought judicial confirmation of the arbitration awards. To intervene in the federal action, the pipefitters union and the Association obtained the plumbers union's consent to intervene. The district court then set aside the arbitration awards, finding that "under the [Association's] Constitution, the [plumbers unions] were not free to arbitrate the question of trade line jurisdiction." Contracting Plumbers, 842 F.2d at 466 (characterizing district court's decision). The case was appealed to the Second Circuit on several grounds, one of which was whether the pipefitters union and the Association had standing to challenge the arbitration awards.

Finding that there was "little question" that the non-parties had a "substantial interest in the arbitrations," the Second Circuit concluded that the pipefitters union and the Association "may intervene as of right under Rule 24(a)." Contracting Plumbers, 841 F.2d at

467. The Second Circuit's conclusion that the pipefitters union and the Association—non-parties to the arbitration—had a substantial interest in the federal action was based on "one of the primary reasons for [the Association's] existence: to avoid trade line jurisdiction disputes between the local unions." Contracting Plumbers, 841 F.2d at 467.

The import of Contracting Plumbers is that in certain limited situations, a non-party may have so substantial an interest in an arbitration that it should be permitted to intervene as of right in a subsequent federal confirmation proceeding. In the aftermath of Contracting Plumbers, courts have closely adhered to that limited exception. Meshkin, 2007 WL 2462172, at *1 (recognizing but declining to apply limited exception); Frere v. Orthofix, Inc., 2002 WL 1543857, at *3 (S.D.N.Y. July 15, 2002) (despite rule that "many courts have not allowed a non-party to an arbitration proceeding to bring a motion for vacatur," recognizing limited application of Contracting Plumbers and "assum[ing], for the purpose of this motion, that Petitioners' have standing because their contractual rights to [payment] are substantially affected by the Arbitration") (emphasis added). The "substantial interest" in Contracting Plumbers was preserving the Association's jurisdiction over union disputes since any arbitration circumventing the Association's authority to resolve jurisdictional disputes between unions would "directly affect [the pipefitters union and the Association's] rights as they prevent the [Association] from exercising its constitutional authority to establish work jurisdiction among its local unions." Contracting Plumbers, 841 F.2d at 466–67. In other words, foreclosing the Association from challenging the arbitration awards would have directly resulted in an outcome where the Association's very existence would have been jeopardized.

Here, the Proposed Intervenors fail to demonstrate a substantial interest in the arbitration. This is a problem of their own making. The Proposed Intervenors argue that they

8

had no reason to know about or participate in this arbitration because Bridger Logistics had already sold BTS. (Mot. at 4–5.) They maintain that Bridger Logistics' sale of BTS was legitimate. Crediting that contention, the Proposed Intervenors would have had no reason to intervene in the arbitration. The only reason the Proposed Intervenors now claim an interest is because the Pennsylvania Action presents the threat that JTS's stipulated liability will be imputed to them. Put another way, absent the allegations in the Pennsylvania Action, the Proposed Intervenors probably would not seek intervention here.

The Proposed Intervenors straddle untenable positions. In the Pennsylvania Action, they disavow their affiliation with the parties to the arbitration, claiming that they were never alter egos of BTS, and that the breach of the Agreement occurred <u>after</u> BTS was sold to Jamex Holdings. (Mot. at 4; Pennsylvania Action, ECF No. 35, at 10–19.) On the other hand, the Proposed Intervenors contend that they should be allowed to intervene in this action because Eddystone now seeks to weaponize the Arbitration Award against them in the Pennsylvania Action. This argument appears rooted in their belief that because at one point they controlled BTS, they have a substantial interest in challenging the validity of the Arbitration Award. But that position is somewhat removed from the type of interest that the Second Circuit has recognized in <u>Contracting Plumbers</u>. More specifically, Eddystone must first prevail on its alter ego claim in the Pennsylvania Action before the Proposed Intervenors' interest materializes into something substantial.

Separately, as the Supreme Court held in <u>Town of Chester, N.Y. v. Laroe Estates, Inc.</u>, 137 S. Ct. 1645, 1651 (2017), "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." Here, the Proposed Intervenors seek relief that is different from what either Eddystone or JTS request—

9

vacatur of the Arbitration Award. Thus, before considering whether the Proposed Intervenors may intervene as of right, this Court must assess whether they have established standing in this particular action. Setting aside the issue of whether the FAA confers standing to challenge an arbitration award, the Proposed Intervenors fail to establish a critical element of the "irreducible constitutional minimum" of standing—an "injury in fact." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

Here, the Proposed Intervenors seek to vacate the Arbitration Award as part of their defense strategy in the Pennsylvania Action—that they are not alter egos of JTS, and even if they are, they should not be held liable for the damages JTS stipulated to in the Arbitration Award. But that reason alone is insufficient to demonstrate an injury in fact because it is "just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case." Whitmore v. Arkansas, 495 U.S. 149, 160 (1990). Because an alter ego finding has yet to be made in the Pennsylvania Action, any purported injury that the Proposed Intervenors claim they suffered is not "concrete in both a qualitative and temporal sense," nor is it "distinct and palpable" or "actual or imminent, not conjectural or hypothetical." Whitmore, 495 U.S. at 155.

Accordingly, this Court finds that the Proposed Intervenors lack standing to challenge the Arbitration Award. Notwithstanding that conclusion, because the "substantial interest" inquiry relates closely to some of the Rule 24(a) factors, a more fulsome discussion of the Proposed Intervenors' interest in this litigation is warranted.

II. Intervention as of Right

Rule 24(a)(2) provides for intervention as of right to anyone who, on timely motion, "claims an interest relating to the property or transaction that is the subject of the action,

and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Thus, the intervenor must: (1) file a timely motion; (2) show an interest in the litigation; (3) show that its interest may be impaired by the disposition of the action; and (4) show that its interest is not adequately protected by the parties to the action. D'Amato v. Deutsche Bank, 236 F.3d 78, 84 (2d Cir. 2001). "Failure to meet any one of these requirements suffices for a denial of the motion." In re Holocaust Victim Assets Litig., 225 F.3d 191, 197–98 (2d Cir. 2000) (citation omitted).

      A. Timeliness of Motion

"Factors to consider in determining timeliness include: (a) length of time the applicant knew or should have known of its interest before making the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusual circumstances militating for or against a finding of timeliness." MasterCard Int'l Inc. v. Visa Int'l Servs. Ass'n, Inc., 471 F.3d 377, 390 (2d Cir. 2006) (internal citation omitted). "Timeliness is not defined by the Rule, and is therefore left largely to the court's discretion which must be guided by consideration of all of the circumstances surrounding the requested intervention." Underwood v. State of N.Y. Office of Court Admin., 1983 WL 504, at *3 (S.D.N.Y. Apr. 29, 1983).

Eddystone contends that the Proposed Intervenors had notice of the arbitration when Eddystone subpoenaed Ferrellgas for relevant documents relating to JTS. According to Eddystone, the Proposed Intervenors had ample opportunity to intervene in the arbitration yet chose not to. They did this knowing that Eddystone might attempt to enforce an arbitration award against them. (Subpoena Action, ECF No. 6, at 1, 2 n.1.)

11

But Eddystone's nascent plan to sue the Proposed Intervenors and the Proposed Intervenors' awareness of an unrelated arbitration were distinct issues during the summer of 2016. Eddystone and JTS were in the throes of lengthy arbitral discovery, with no certainty that Eddystone would prevail on the merits. It would have been counterintuitive for the Proposed Intervenors to inject themselves into an arbitration because such an intervention would undermine their position that they were no longer affiliated with BTS. Moreover, at that point, the Proposed Intervenors had little reason to believe that the parties would settle, let alone for such an exorbitant sum. Even after news of the settlement, the Proposed Intervenors would have had no reason to intervene unless (and until) Eddystone commenced a lawsuit seeking to hold them responsible for JTS's liability. Thus, until the Pennsylvania Action was commenced, it was pointless to speculate about what Eddystone might do.

The Pennsylvania Action began on February 2, 2017. This proceeding followed about two weeks later. With Eddystone's strategy now crystallized, the Proposed Intervenors made their timely appearance in this action on February 28, 2017, just eleven days after the Petition was filed. Thus, the first factor of the timeliness inquiry weighs in favor of the Proposed Intervenors.

The second factor to be considered is prejudice to the existing parties due to any delay in intervention. This "factor encompasses the basic fairness notion that intervention should not work a last minute disruption of painstaking work by the parties and the court." In re Akron Beacon Journal, 1995 WL 234710, at *7 (S.D.N.Y. Apr. 20, 1995) (citation omitted). There is no prejudice to either Eddystone or JTS at such an early stage in this proceeding, and even if there were, any such prejudice would be outweighed by the third factor to be considered—the prejudice suffered by the Proposed Intervenors if their application is denied on timeliness

grounds. Finally, there are no unusual circumstances militating for or against a finding of timeliness. Therefore, on balance, the timeliness factor weighs in favor of the Proposed Intervenors' application.

B. Adequate Representation of Interests

While there is generally a "presumption of adequacy" in intervention cases, "evidence of collusion, adversity of interest, nonfeasance, or incompetence may suffice to overcome the presumption." Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 180 (2d Cir. 2001). The burden of showing that the Proposed Intervenors' interests are not adequately protected by an existing party is "minimal." CBS Inc. v. Snyder, 136 F.R.D. 364, 368 (S.D.N.Y. 1991).

There is no dispute that the Proposed Intervenors' interests, to the extent that they are cognizable under Rule 24(a)(2), are not adequately represented by either Eddystone or JTS. Eddystone obviously seeks judicial confirmation of a $139 million arbitration award in its favor. JTS does not object to that. (Hr'g Tr. dated July 14, 2017, ECF No. 52, at 34:18–20.) Without any party opposing confirmation of the Arbitration Award, this factor weighs in favor of the Proposed Intervenors' application.

C. Proposed Intervenors' Interest in Property or Transaction Underlying Subject Matter of the Litigation

Rule 24(a)(2) demands a showing that the intervenor has an interest relating to the property or transaction which is the subject matter of this action. The Proposed Intervenors posit that a "party whose interest may be impaired by the result of a lawsuit possesses a 'clear interest' in its outcome and ultimately satisfies the second factor for an intervention by right." (Mot. at 11 (citation omitted).) As an initial matter, this argument "conflate[s] the separate requirements under Rule 24(a)(2) that [the Proposed Intervenors] have an interest and that their interest may

13

be impeded or impaired." Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 550 B.R. 241, 250 (Bankr. S.D.N.Y. 2016) (rejecting the argument that an adverse judgment in one action will impair proposed intervenors' ability to defend their own actions); Friends of East Hampton Airport, Inc. v. Fed. Aviation Admin., 2016 WL 792411, at *7 (E.D.N.Y. Feb. 29, 2016) (argument that the disposition of another lawsuit can impact the proposed intervenor's ability to defend itself in the underlying action "conflates the second and third Rule 24(a) factors").

The Proposed Intervenors' apparent interest, as best this Court can discern, is the right to challenge the Arbitration Award because confirmation of such award will adversely affect their ability to mount a defense in the Pennsylvania Action. (Mot. at 13 ("[C]onfirmation of the Alleged Arbitration Award by this court may vitiate those defenses [in the Pennsylvania Action] without the Proposed Intervenors ever being afforded an opportunity to challenge the validity of the Alleged Arbitration Award.").) But that winding articulation of the Proposed Intervenors' interest merely underscores its contingent and remote nature.

"Although there is no clear consensus as to what constitutes an 'interest' under Rule 24(a)(2), the plain language of the rule indicates that the 'interest' must pertain to 'the property or transaction' that comprises 'the subject of the action.'" Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 1996 WL 346352, at *3 (S.D.N.Y. June 25, 1996) (citations omitted). In the context of intervention as of right, the "Supreme Court has stated that the interest must be significantly protectable." Restor-A-Dent Dental Labs., Inc. v. Certified Alloy Prods., Inc., 725 F.2d 871, 874 (2d Cir. 1984) (citing Donaldson v. United States, 400 U.S. 517, 531 (1971)). Moreover, the "interest must be direct, as opposed to remote or contingent." Restor-A-Dent, 725 F.2d at 874.

14

Here, the Proposed Intervenors lack a direct interest in the property or transaction that is the subject of this action. The Arbitration Award, which reflects a settlement between JTS and Eddystone regarding JTS's breach of the Agreement, binds JTS to a $139 million payment. That breach, according to the Proposed Intervenors, occurred <u>after</u> their sale of JTS's predecessor. And even today, both here and in the Pennsylvania Action, the Proposed Intervenors disavow any affiliation with JTS.

Rather, the Proposed Intervenors' interest here is "contingent upon the occurrence of a sequence of events before it becomes colorable." Washington Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec., 922 F.2d 92, 97 (2d Cir. 1990). The court in the Pennsylvania Action must make a determination that the Proposed Intervenors had an alter ego relationship with BTS, that it existed after BTS's sale to Jamex Holdings, and that the control which the Proposed Intervenors exercised over JTS extended to breaching the Agreement. Although the Pennsylvania court denied the Proposed Intervenors' motion to dismiss the alter ego claim, such a ruling is not a merits determination that the Proposed Intervenors are responsible for JTS's actions. See Compagnie Noga D'Importation et D'Exportation S.A. v. The Russian Federation, 2005 WL 1690537, at *4 (S.D.N.Y. July 20, 2005) (denying motion to intervene where movant's interest had not "crystallized" and was therefore "wholly collateral to [the] action"). In fact, if the Pennsylvania court ultimately finds that no alter ego relationship exists, the Proposed Intervenors would have no reason to dispute a $139 million award. That the Proposed Intervenors' interest turns on another court's prospective ruling underscores the contingent nature of the Proposed Intervenors' interest. Thus, because their "claim is dependent upon a court ruling on an ancillary legal issue," it is "too attenuated to warrant intervention." Tymoshenko v. Firtash, 2011 WL 5059180, at *2 (S.D.N.Y. Oct. 19, 2011); Katz v. Berisford

15

Int'l PLC, 2000 WL 1760965, at *5 (S.D.N.Y. Nov. 30, 2000) ("The possibility that a party will establish an interest in a judgment through a pending lawsuit in another court is a contingent interest."); Washington Elec., 922 F.2d at 97.

Accordingly, the Proposed Intervenors fail to articulate an interest in the property or transaction relating to the subject matter of this action.

D. Impaired Interest by Disposition of the Litigation

To show that their interest will be impaired by the disposition of this action, the Proposed Intervenors contend that confirmation of the Arbitration Award could have a preclusive effect in the Pennsylvania Action. That is, the Proposed Intervenors maintain that a confirmed Arbitration Award would rob them of their defenses in the Pennsylvania Action which, among others, include whether there was an alter ego relationship between the parties and whether a breach of the Agreement occurred. The Proposed Intervenors fear that this Court's confirmation of the Arbitration Award will compel the Pennsylvania court to bind them "as to the issue of JTS's liability to Eddystone, and the amount thereof, even though [they] did not participate in the arbitration." (Mot. at 15.)

"This hypothetical effect of an adverse judgement on any rights that [the Proposed Intervenors] may have against [Eddystone], however, is not the type of practical impairment contemplated by Rule 24(a)(2)." Union Switch & Signal, Inc. v. St. Paul Fire & Marine Ins. Co., 226 F.R.D. 485, 488 (S.D.N.Y. 2005). The Proposed Intervenors' impairment argument suffers from a major defect—it is steeped in the assumption that they will lose on the alter ego issue in the Pennsylvania Action. But confirmation of the Arbitration Award alone has no bearing on the Proposed Intervenors' ability to defend themselves against the principal claim that they are alter egos of JTS. What this Court does will not constrain them from vigorously asserting in the

16

Pennsylvania Action that they were not affiliated with BTS or JTS, and that they had no involvement in the alleged breach of the Agreement.[2]

The only effect of confirming the Arbitration Award is that Eddystone will be given a federal decree holding JTS responsible for $139 million in damages arising from a contract dispute resolved in arbitration. To the extent the Arbitration Award presents any preclusive effect, it is limited to JTS. It may only come into play if the Pennsylvania court determines the alter ego issue against the Proposed Intervenors.

In any event, if the Arbitration Award is converted into a federal judgment, the issue of whether it has preclusive effect in the Pennsylvania Action is a matter to be decided by the Pennsylvania court. Covanta Onondaga Ltd. v. Onondaga Cnty. Resource Recovery Agency, 318 F.3d 392, 397–98 (2d Cir. 2003) ("The first court does not get to dictate to other courts the preclusion consequences of its own judgment.") (citation omitted). Finally, although the Proposed Intervenors argue that the doctrine of stare decisis will constrain their ability to defend themselves in the Pennsylvania Action, confirmation of an Arbitration Award hardly constitutes a "conclusion[] of law on issues of first impression" that would "control any subsequent lawsuit." Oneida Indian Nation v. New York, 732 F.2d 261, 265–66 (2d Cir. 1984). Moreover, "[i]f stare decisis were the sole criteria under Rule 24(a)(2), there would be an intervention free for all. Any person whose interests might be impaired or impeded by an adverse decision in an unrelated litigation could intervene as of right." Madoff, 550 B.R. at 250.

---

[2] In fact, it also appears that Bridger Logistics and Ferrellgas filed counterclaims against Eddystone, maintaining that if the Pennsylvania court finds them "liable under any theory for damages due to Eddystone" they will seek relief under theories of fraudulent inducement, negligent misrepresentation, breach of contract, breach of the covenant of good faith and fair dealing, and rescission. (Pennsylvania Action, ECF Nos. 67 at 27, and 68 at 29.) If they prevail on their counterclaims, that may nullify the effect of any contractual liability memorialized in the Arbitration Agreement as to them.

Accordingly, the Proposed Intervenors have not shown that their interests will be impaired by the disposition of this action.

III. Permissive Intervention

In the alternative, the Proposed Intervenors seek permissive intervention under Rule 24(b), which provides that, on timely motion, intervention may be permitted to anyone who "has a claim or defense that shares with the main action a common question of law or fact." Once timeliness and a common question of fact or law have been established, this Court may, in its discretion, consider a host of factors in determining whether to permit intervention. The "principal consideration . . . is whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Brennan, 579 F.2d at 191. "Permissive intervention is wholly discretionary with the trial court." U.S. Postal Serv. v. Brennan, 579 F.2d 188, 191 (2d Cir. 1978).

As an initial matter, "the considerations that render [the Proposed Intervenors] ineligible for intervention as of right under Rule 24(a) here militate strongly as well against granting permissive intervention under Rule 24(b)." State Comm. of Independence v. Berman, 2003 WL 22801908, at *1 (S.D.N.Y. Nov. 21, 2003). Assessed under Rule 24(b)'s framework, the Proposed Intervenors fail to demonstrate that their claim or defense shares a common question of law or fact with this confirmation proceeding. The Proposed Intervenors are not affiliated with JTS. They maintain that any contractual obligations owed to Eddystone were transferred away soon after Bridger Logistics sold BTS. They disclaim any knowledge of the underlying contractual breach. And because they were not participants in the underlying arbitration, they lack first-hand knowledge of that proceeding. They seek to intervene in this proceeding only because of an inchoate fear that any judgment confirming the Arbitration Award

may be enforced against them if Eddystone is successful in the Pennsylvania Action. That does not warrant permissive intervention.

Moreover, "[a]ctions to confirm arbitration awards . . . are straightforward proceedings in which no other claims are to be adjudicated. The confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." Ottley v. Schwartzberg, 819 F.2d 373, 377 (2d Cir. 1987). Inviting non-parties to this arbitration confirmation proceeding, whose interests are conditioned on the outcome of a separate, pending action in another jurisdiction, would unduly delay what is otherwise supposed to be a straightforward action. See Washington Elec., 922 F.2d at 97 (intervention "cannot be used as a means to inject collateral issues into an existing action"). To the extent the Proposed Intervenors seek to litigate issues pertaining to the Agreement, the alleged breach, the BTS sale, and the relationships among the parties to each of these transactions, they are free to do so in the Pennsylvania Action. Accordingly, the Proposed Intervenors' request for permissive intervention is denied.

## CONCLUSION

For the foregoing reasons, the Proposed Intervenors' motion to intervene is denied. The Clerk of Court is directed to terminate the motion pending at ECF No. 30.

Dated: February 7, 2018
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.